**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

LUKAS BALINT,

Plaintiff,

v.

CITY OF WINTER PARK, FLORIDA;
DAVID GRAHAM, individually;
ALYSSA EWING, individually;
DANIEL PUSHOR, individually;
ALICIA SPAIN, individually;
NICHOLAS THOMAS, individually;
and BRYAN FRIDAY, individually,

Defendants.

Case No.: 6:26-cv-02289

COMPLAINT AND DEMAND FOR JURY TRIAL

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Lukas Balint, by and through undersigned counsel, sues Defendants and alleges as follows:

## NATURE OF THE ACTION

1. This civil-rights action arises from the warrantless stop, handcuffing, confinement, and prolonged custodial interrogation of then-sixteen-year-old Lukas Balint on February 7, 2025, while he was walking home in his own Winter Park neighborhood with a fractured ankle in a walking boot.

2. Lieutenant David Graham saw Lukas and two friends walking on a sidewalk. Graham had no report of a crime attributable to Lukas, observed no offense, and later acknowledged that walking on the sidewalk was lawful. Nevertheless, Graham pursued the teenagers in a large, heavily tinted, unmarked vehicle, detained Lukas when he complied with a command to stop, threatened potential burglary, trespass, loitering-and-prowling, and resisting charges, and demanded information about Lukas's friends.

3. Officer Alyssa Ewing then handcuffed the compliant and visibly injured minor and confined him in the rear of a police vehicle. Officers prolonged the detention while searching a nearby construction site and attempting to locate the other teenagers, even though no crime had been reported and no incriminating evidence had been found.

4. This action seeks redress under 42 U.S.C. § 1983 for violations of the Fourth Amendment, together with related Florida-law relief. Plaintiff does not assert a standalone Miranda claim because the records presently available do not show that any statement was used against him in a criminal case.

**PARTIES**

5. Plaintiff Lukas Balint is a natural person and resident of Orange County, Florida. He was born July 7, 2008, and is now an adult entitled to prosecute his own claims. At the time of the incident, he was sixteen years old.

6. Defendant City of Winter Park, Florida (the "City"), is a Florida municipal corporation that operates the Winter Park Police Department ("WPPD"). WPPD is identified factually but is not named as a separate defendant because it is an operating department of the City rather than a separate juridical entity.

7. Defendant David Graham was at all material times a WPPD lieutenant. He is sued in his individual capacity. Graham acted under color of state law and invoked his police authority throughout the encounter, including while working an off-duty detail for the Windsong community.

8. Defendant Alyssa Ewing was at all material times a WPPD officer. She is sued in her individual capacity and acted under color of state law.

9. Defendants Daniel Pushor, Bryan Friday, Alicia Spain, and Nicholas Thomas were at all material times WPPD officers. Each is sued in an individual capacity and acted under color of state law.

**JURISDICTION AND VENUE**

10. This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiff asserts claims under the Fourth Amendment and 42 U.S.C. § 1983.

11. This Court has supplemental jurisdiction over the related Florida-law claims under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts.

12. Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b) because the events occurred in Winter Park, Orange County, Florida, within the Orlando Division, and the City resides in this District.

**CONDITIONS PRECEDENT AND NOTICE**

13. On September 26, 2025, written notice of claim was directed to WPPD Risk Management under section 768.28, Florida Statutes, on behalf of Lukas, then a minor. The notice identified the February 7, 2025 incident, the involved officers, and the nature of the federal and state claims. More than six months have elapsed. To the extent any additional notice to the Florida Department of Financial Services is required for a particular state-law claim, Plaintiff alleges compliance or, alternatively, will promptly cure and seeks no adjudication of that claim before statutory conditions are satisfied.

14. All other conditions precedent have occurred, have been performed, or have been waived.

**FACTUAL ALLEGATIONS**

*February 7, 2025, Incident in the Windsong Residential Community*

15. At approximately 10:10 p.m. on February 7, 2025, Lukas and two teenage friends were walking on sidewalks in or near the Windsong residential community. They were traveling between friends' homes. Lukas was wearing pajamas and a walking boot because of a recently fractured ankle.

16. Graham was performing a paid security detail in a large, heavily tinted, unmarked police vehicle. He saw the teenagers walking. He had no dispatch concerning them, no identified complainant, no report of a burglary or trespass by them, and no description linking Lukas to any crime.

17. Graham drove past, turned around, and followed them. Before he activated emergency lights or identified himself, the teenagers reasonably perceived an unknown tinted vehicle following them at night and moved away from it.

18. When Graham later encountered Lukas and commanded, "police, stop," Lukas immediately stopped. Lukas did not flee, threaten anyone, reach for a weapon, resist, or attempt to enter any building. Graham acknowledged that Lukas's injured foot was the reason Lukas could not move quickly.

19. Graham ordered Lukas to keep his hands visible and interrogated him about where his friends had gone. Graham threatened that the situation could become "a bigger issue" involving burglary and trespass, despite lacking evidence that Lukas had entered, attempted to enter, or intended to enter any structure.

20. Graham stated that the teenagers' conduct was "unusual" and repeatedly relied on their having moved out of view and supposedly hidden. He did not identify objective facts establishing that Lukas was committing, had committed, or was about to commit a crime.

21. When Lukas asked whether anyone had robbed a house, Graham did not identify any reported offense. Instead, Graham stated that the community hired him because "there's issues always around the area."

22. Graham directed Lukas to telephone his friends, took over a call, and ordered the other teenagers to return. Lukas remained compliant.

23. At Graham's direction or with his approval, Ewing placed Lukas in handcuffs after Lukas said he did not recall where he was when the emergency lights were activated. The handcuffing was used to compel answers and secure the scene, not in response to resistance, flight, a weapon, or a particularized safety threat.

24. Officers placed Lukas in the rear of Ewing's police vehicle. He was not free to leave. Officers referred to him as "secured," instructed another officer to watch him, and left him confined while officers searched a nearby construction site for the other teenagers.

25. The construction-site search disclosed no teenager, contraband, stolen property, evidence of burglary, or evidence tying Lukas to any offense.

26. While confined, Lukas repeatedly expressed fear and asked to contact his parents. An officer dismissed his request, told him that being a minor "doesn't matter," told him to "mind [his] manners," disparaged his knowledge, and threatened that information would appear in an affidavit.

27. Lukas questioned why he was being detained and tried to call 911 because he was confined in an unmarked vehicle and feared for his safety. An officer told him that calling 911 in those circumstances was "a charge."

28. The detention continued after any legitimate safety concern had dissipated. Lukas had been compliant, the construction site was clear, no crime had been reported, and no evidence of wrongdoing existed. The available records indicate that the handcuffed vehicle detention lasted approximately thirty minutes or longer.

29. Graham later told another parent that walking on the sidewalk was "normally fine," that no one was in trouble, and that "there's no crime that we're gonna be charging anyone with." He characterized the matter as "educational" and a "field contact," not an offense report.

30. Graham also stated that the incident would be documented to identify a "pattern" in the future. The field-contact rationale was administrative and intelligence-gathering, not a lawful basis for the existing seizure.

31. After the handcuffs were removed, officers photographed Lukas, collected personal identifying information, continued to control his movement, and prevented him from using his phone freely until they decided the encounter was over.

32. Lukas told officers the event had been rough and traumatic, including because he had been handcuffed and denied timely access to his parents. An officer minimized that harm as a matter of personal perception and called the incident a "learning experience" and "character building."

33. No citation, delinquency referral, charge, or arrest affidavit was issued against Lukas. He was eventually released to his parents.

34. As a direct and proximate result of Defendants' conduct, Lukas suffered loss of liberty, fear, humiliation, emotional distress, mental anguish, invasion of privacy, and other compensable injuries. His damages continue and will be proven at trial.

*Winter Park Police Department Policy, Custom, and Deliberate Indifference*

35. The available records reveal that six WPPD officers responded to a noncriminal field contact involving teenagers walking in a residential neighborhood, and that multiple officers participated in, observed, facilitated, or failed to stop the handcuffing and vehicle confinement of a compliant minor.

36. Graham was a lieutenant and scene commander. His decisions directed the detention, escalation, deployment of additional units, construction-site search, continued confinement, coercive questioning, intelligence gathering, and preparation of a field-contact record.

37. The officers repeatedly described the conduct as "educational," stated that hiding from police is itself wrong, threatened loitering-and-prowling or resisting consequences without adequate legal predicates, and treated compelled compliance and information gathering as legitimate ends of detention.

38. Upon information and belief, the City maintained customs, practices, training deficiencies, supervisory practices, or ratification concerning: (a) investigative detentions based on generalized "unusual" behavior; (b) handcuffing compliant minors without individualized safety facts; (c) prolonged field contacts to locate third persons; (d) coercive threats of loitering-and-prowling or resisting charges; (e) intelligence-gathering field-contact reports absent criminal conduct; and (f) failure to intervene in unlawful juvenile seizures.

39. At all times material, WPPD, promulgated written standard operating procedures governing officer encounters with members of the public, including the justification for investigative detentions and arrests, the prohibition against biased policing, the permissible use of force, de-escalation, intervention, medical care, reporting, supervision, review, and training.

40. One such written directive is WPPD Standard Operating Procedure No. 222, titled "Use of Force." The produced version states an effective date of August 4, 2020, Winter Park Police Department, Standard Operating Procedure No. 222, Use of Force, at 1, 18 (effective Aug. 4, 2020) ("WPPD SOP 222").

41. SOP 222 states that its purpose is to establish guidelines governing the use of force, including deadly force, and to define reporting and notification procedures for force incidents. WPPD SOP 222 § 222-1, at 1.

42. WPPD required members to receive a copy of and instruction concerning SOP 222 and current use-of-force law before authorization to carry a department-issued weapon or firearm. The policy required field-training instruction and documentation by the field-training officer. WPPD SOP 222 § 222-2(A), at 1.

43. SOP 222 directs that officers engaged in the lawful execution of a legal duty "will use the least amount of force reasonably necessary to accomplish their objective" and that "[a]ll prisoners and suspects will be treated in a fair and humane manner." WPPD SOP 222, § 222-2(B), at 1.

44. SOP 222 defines "Unnecessary Force" as "[f]orce that has no lawful justification." WPPD SOP 222, § 222-3(C), at 1.

45. SOP 222 defines "Excessive Force" as "[f]orce that exceeds authorized force justified by Florida State Statute and policy in subduing and/or taking control of a suspect." WPPD SOP 222, Use of Force § 222-3(D), at 1).

46. WPPD defines de-escalation as actions taken to stabilize a situation, reduce the immediacy of a threat, and create additional time, options, and resources, with the goal of obtaining voluntary compliance and reducing or eliminating the need for force. WPPD SOP 222 § 222-3(H), at 2.

47. SOP 222 requires that, "[i]n all situations, members will use only that force which they reasonably believe to be necessary to make an arrest or achieve lawful objectives." WPPD SOP 222, § 222-4(A), at 2.

48. Before using force, WPPD directs officers to consider the severity of the suspected offense, whether the subject poses an immediate threat, the level of resistance, and whether a warning can feasibly be given without compromising safety. WPPD SOP 222 § 222-4(D)(1)-(4), at 3.

49. SOP 222 provides: "Unnecessary or excessive force is clearly improper and unlawful, and such force shall not be tolerated." WPPD SOP 222, § 222-4(E), at 3.

50. SOP 222 requires sworn and civilian members to report witnessed or discovered excessive or unnecessary force. WPPD SOP 222 § 222-5(A), at 3.

51. SOP 222 provides that "every police officer has a duty to act and intervene if they observe another member using force which is objectively unreasonable" and requires intervention to stop or attempt to stop unreasonable force. WPPD SOP 222, Use of Force § 222-5(B), at 3.

52. SOP 222 distinguishes passive, active, aggressive, and deadly-force resistance and describes the conduct associated with each category. WPPD SOP 222 § 222-7(A)(1)-(4), at 4.

53. SOP 222 directs that officers "should always try to resolve a situation with the least amount of force necessary" and recognizes that command presence and verbal communication often defuse volatile situations. WPPD SOP 222, § 222-7(B), at 4.

54. SOP 222 mandates that "[a]n officer shall use de-escalation techniques consistent with his/her training whenever possible and appropriate before resorting to force, and to reduce the need for force." Winter Park Police Department, Standard Operating Procedure No. 222, Use of Force § 222-7(B)(1), at 4 (effective Aug. 4, 2020).

55. The WPPD Force Guideline Flowchart requires consideration of subject resistance, situational factors, officer response, and justification, including whether the officer complied with constitutional and state law, agency policy, and training. WPPD SOP 222 § 222-8(A)-(D), at 7-8.

56. When force produces an injury, suspected injury, or complaint of injury, SOP 222 provides that "the member shall initiate first aid or summon EMS personnel to assess and aid the injured person, unless doing so would compromise the member's safety." WPPD SOP 222, § 222-9(B), at 8.

57. When using physical force, officers must make every reasonable effort to prevent injury to the person against whom force is used. WPPD SOP 222 § 222-10(F)(1), at 11.

58. SOP 222 requires a Use of Force report when force against an actively or passively resisting person goes beyond routine handcuffing, including takedowns, pressure points, and knee spikes. WPPD SOP 222 § 222-13(C)(1)-(5), at 17.

59. SOP 222 requires written force reports before the end of shift and chain-of-command review through the Chief of Police. WPPD SOP 222 § 222-13(D), at 17.

60. WPPD also produced Standard Operating Procedure No. 105, titled "Bias-Free Policing." The produced version states that it became effective August 4, 2025, and amended SOP 105 dated March 3, 2020. Winter Park Police Department, Standard Operating Procedure No. 105, Bias-Free Policing, at 1 (effective Aug. 4, 2025) ("WPPD SOP 105 (2025)").

61. The stated purpose of SOP 105 (2025) is to affirm WPPD's continuing commitment to unbiased policing in all encounters between officers and citizens. WPPD SOP 105 (2025) § 105-1, at 1.

62. SOP 105 (2025) states that it provides guidelines to prevent biased policing and reinforces procedures intended to maintain public confidence and trust by delivering police services fairly and equitably. It also states that WPPD prohibits biased policing in accordance with Florida law. WPPD SOP 105 (2025) § 105-2, at 1.

63. SOP 105 (2025) states that WPPD and its members are charged with protecting those rights for all, regardless of race, color, ethnicity, or national origin. WPPD SOP 105 (2025) § 105-3(B), at 1.

64. SOP 105 (2025) provides: "Police action which is biased is illegal and violates the equal protection clause and the Fourth Amendment of the Constitution." WPPD SOP 105, § 105-3(C), at 1 (effective Aug. 4, 2025).

65. SOP 105 (2025) defines "Biased Policing" as "[t]he inappropriate consideration of specified characteristics while enforcing the law or providing police services," including race, ethnic background, national origin, gender, gender identity, sexual orientation, religion, socioeconomic status, age, disability, political status, and other legally protected characteristics. WPPD SOP 105, § 105-4(B), at 2.

66. SOP 105 (2025) defines a "Detention" as stopping or restraining a person's freedom to leave or walk away, questioning beyond a consensual encounter, or stopping a person suspected of criminal activity. WPPD SOP 105 (2025) § 105-4(C), at 2.

67. SOP 105 (2025) defines "Reasonable Suspicion" as facts or circumstances that would lead an officer reasonably to believe a person has been, is, or is about to be engaged in criminal activity. WPPD SOP 105 (2025) § 105-4(D), at 2.

68. SOP 105 (2025) defines a "Stop" as the restraint of a person's liberty by physical force or submission to a show of authority. WPPD SOP 105 (2025) § 105-4(E), at 2.

69. SOP 105 (2025) requires all investigative detentions, traffic stops, arrests, searches, and property seizures to rest on reasonable suspicion or probable cause as required by the Fourth Amendment and statutory authority. It requires officers to articulate the specific facts, circumstances, and conclusions supporting the asserted justification. WPPD SOP 105 (2025) § 105-5(A), at 2.

70. SOP 105 (2025) provides that legally protected characteristics "can never be used as the sole basis for establishing reasonable suspicion or probable cause," while allowing limited consideration as one component of the totality of

circumstances in the restricted circumstances stated in the policy. WPPD SOP 105, Bias-Free Policing § 105-5(C), at 2 (effective Aug. 4, 2025).

71. SOP 105 (2025) provides: "No motorist or pedestrian, once cited or warned, shall be detained beyond the point where there exists no reasonable suspicion of further criminal activity or other legal or factual basis for detention." WPPD SOP 105, § 105-5(D)(4), at 3 (effective Aug. 4, 2025).

72. SOP 105 (2025) requires all sworn members to receive fair-and-impartial-policing training, including legal aspects, and requires recruit training during field-training orientation. WPPD SOP 105 (2025) § 105-7, at 4.

73. Read together, SOP 222 and the produced SOP 105 address distinct but interrelated stages of a police encounter: the legal basis and nondiscriminatory justification for a stop, detention, arrest, search, or seizure; the degree of permissible force; duties to de-escalate and intervene; medical assistance; reporting; complaint intake; supervisory review; corrective action; and recurring training and administrative review.

74. Further, WPPD's own field-contact materials referenced "similar incidents/contact with these juveniles," and Graham stated that an earlier juvenile incident suggested a potential "pattern." Those statements support a reasonable inference that the February 7 detention was not treated internally as an isolated

constitutional deviation but as an implementation of recurrent juvenile-contact practices.

75. Upon information and belief, policymakers had actual or constructive notice of the obvious risk that these practices would cause unconstitutional seizures, yet failed to correct training, scountupervision, review, and discipline. The coordinated conduct and absence of on-scene correction permit the further inference that the conduct was accepted, ratified, or consistent with City practice.

**COUNT I**
**FOURTH AMENDMENT UNREASONABLE SEIZURE - 42 U.S.C. § 1983**
**(DEFENDANTS GRAHAM AND EWING ONLY)**

76. Plaintiff incorporates paragraphs 1 through 76 as if fully set forth.

77. At all material times, Graham and Ewing acted under color of state law by exercising powers made possible only because they were sworn WPPD officers, displaying and invoking police authority, issuing commands, using police equipment and a police vehicle, and purporting to investigate and enforce Florida criminal law.

78. A Fourth Amendment seizure occurred when Graham identified himself as a police officer, commanded Lukas to stop, ordered Lukas to keep his hands visible, controlled his movement, compelled him to remain at the scene, and

communicated through words and conduct that Lukas was not free to disregard the officers and leave. Lukas submitted to that show of authority.

79. Ewing separately and additionally seized Lukas when she physically placed him in handcuffs, placed him into the rear of a police vehicle, closed or controlled the vehicle, guarded him, restricted his telephone use, and maintained custody until officers chose to release him.

80. An investigatory detention is lawful at its inception only when the detaining officer possesses a particularized and objective basis to suspect that the person detained has committed, is committing, or is about to commit a specific crime. A hunch, generalized concern, presence in an area associated with prior problems, lawful walking at night, or conduct susceptible to an innocent explanation does not alone establish reasonable suspicion.

81. When Graham initiated the seizure, he knew only that Lukas and two teenagers had walked on public or residential sidewalks, had briefly moved from his view after an unmarked and heavily tinted vehicle followed them at night, and that Lukas later walked away from the area. Graham had no report of a completed, ongoing, or impending crime; no complainant; no victim; no forced entry; no alarm; no description of suspects; no observation of trespass, burglary, theft, vandalism, or contraband; and no fact tying Lukas to criminal activity.

82. Before Graham activated emergency lights or identified himself as an officer, Lukas and his friends had no obligation to remain near the unidentified vehicle, answer questions, or make themselves available for a police encounter. Their movement away from an unknown vehicle did not create reasonable suspicion, and Graham could not manufacture suspicion from conduct occurring before the teenagers knew that police authority was being asserted.

83. After Graham identified himself and commanded Lukas to stop, Lukas immediately complied. Lukas did not flee, resist, threaten an officer, reach toward a weapon, enter a building, discard property, conceal evidence, or engage in conduct corroborating any suspected offense. His compliance dissipated rather than strengthened any objectively reasonable concern.

84. Graham nevertheless detained Lukas to determine where his friends had gone, compel Lukas to telephone them, order them to return, investigate a construction site, identify the teenagers, photograph Lukas, create a field-contact record, and "educate" the teenagers. Those administrative, intelligence-gathering, and third-party investigative purposes did not furnish a constitutionally sufficient basis to seize Lukas.

85. Even if the initial encounter could be characterized as a permissible brief investigatory stop, Graham and Ewing were required to diligently pursue a means of investigation reasonably calculated to confirm or dispel the suspected

criminal activity quickly and to terminate the detention when reasonable suspicion ceased to exist.

86. Graham and Ewing instead escalated the encounter by handcuffing a compliant sixteen-year-old with a fractured ankle, confining him in a police vehicle, summoning multiple officers, searching for two other teenagers, searching a construction site, threatening unsupported burglary, trespass, loitering-and-prowling, resisting, affidavit, and 911-related consequences, and prolonging custody while pursuing matters unrelated to any objective basis for stopping Lukas.

87. The detention was not reasonably related in scope to the circumstances asserted to justify the encounter. Its methods were more intrusive than necessary, its duration was prolonged by the officers' decision to investigate and locate third persons, and the officers continued the detention after the construction-site search found no person, contraband, stolen property, forced entry, or evidence of any offense.

88. By the time Lukas was handcuffed and placed in the police vehicle, there was no reasonable suspicion sufficient to justify that degree of restraint. Alternatively, the handcuffing and vehicle confinement converted the stop into a de facto arrest for which Graham and Ewing lacked actual or arguable probable cause.

89. Graham was an integral participant in the entire seizure because he initiated the stop, directed the investigation, requested additional units, questioned Lukas, controlled the scene, approved or directed the handcuffing and vehicle confinement, and caused the detention to continue. Ewing was an integral participant because she applied and maintained the handcuffs, confined Lukas in her police vehicle, guarded or arranged for him to be guarded, questioned or controlled him, and failed to release him when no lawful basis remained.

90. A reasonable officer in each Defendant's position would have known that generalized "unusual" behavior and a desire to identify, locate, question, document, or educate teenagers did not authorize a handcuffed custodial detention in the absence of particularized suspicion of a crime. The constitutional violation was objectively apparent and violated clearly established Fourth Amendment law.

91. As a direct and proximate result, Lukas suffered loss of liberty, physical discomfort, fear, humiliation, emotional distress, mental anguish, invasion of privacy, and other damages to be proven at trial.

WHEREFORE, Plaintiff demands judgment against Graham and Ewing, jointly and severally as permitted by law, compensatory damages, nominal damages, punitive damages, declaratory relief, prejudgment and post-judgment interest, reasonable attorney's fees and costs under 42 U.S.C. § 1988, and all further relief the Court deems just and proper.

**COUNT II**
**FOURTH AMENDMENT EXCESSIVE FORCE - 42 U.S.C. § 1983**
**(DEFENDANT EWING ONLY)**

92. Plaintiff incorporates paragraphs 1 through 76 as if fully set forth.

93. Plaintiff pleads this Count as an independent excessive-force claim to the extent the force was excessive even assuming a lawful basis for some temporary detention, and alternatively as force that unreasonably magnified the seizure alleged in Count I.

94. Ewing acted under color of state law when she used physical force and police restraints against Lukas.

95. A law-enforcement officer may use only the degree of force that is objectively reasonable in light of the facts and circumstances confronting the officer, judged from the perspective of a reasonable officer at the scene. Relevant considerations include the severity of any suspected offense, whether the person poses an immediate threat, whether the person is actively resisting or attempting

to flee, the proportionality and necessity of the force, the duration of the force, and the person's known age, condition, and vulnerability.

96. No serious offense was identified or reasonably suspected. Lukas was sixteen years old, wore pajamas and a walking boot, had a visibly fractured or recently fractured ankle, was unarmed, was outnumbered by officers, and was compliant with Graham's commands.

97. Lukas did not threaten anyone, make a hostile movement, reach toward a weapon, actively resist, attempt to flee after the police command, or create an immediate threat to officers or the public. He was standing under police control and answering questions when Ewing applied handcuffs.

98. Ewing knew or reasonably should have known of Lukas's age, injured condition, compliance, and the absence of facts demonstrating a safety risk. No rapidly evolving emergency required immediate physical restraint.

99. Despite those circumstances, Ewing seized Lukas's arms, placed his hands behind his back, applied metal handcuffs, physically placed or directed him into the rear of a police vehicle, and maintained the restraint while officers investigated other teenagers and searched a construction site.

100. The handcuffing and vehicle confinement were not reasonably necessary to protect officer safety, prevent flight, preserve evidence, or accomplish a lawful investigative purpose. Less intrusive means were readily available,

including continued consensual questioning, a brief unrestrained inquiry, contacting Lukas's parents, or ending the encounter.

101. The force was disproportionate to every legitimate governmental interest because Lukas was not suspected of a serious crime, posed no immediate threat, did not resist, and was not attempting to flee. The restraint was instead used to compel cooperation, punish perceived evasiveness, secure Lukas while officers pursued his friends, and reinforce the officers' asserted educational message.

102. Ewing continued the force after it was apparent that Lukas posed no danger and after the asserted investigatory objectives had been satisfied or abandoned. Continued handcuffing and confinement after any possible need for restraint ended constituted an additional and independent use of unreasonable force.

103. The gratuitous use and continuation of force against a compliant, nonthreatening, visibly injured minor was objectively unreasonable. A reasonable officer would have understood that such force was constitutionally excessive, and Ewing is not entitled to qualified immunity.

104. Ewing's acts directly and proximately caused physical pain or discomfort, fear, humiliation, emotional distress, mental anguish, and other injuries and damages to be established through testimony and proof at trial.

WHEREFORE, Plaintiff demands judgment against Ewing for compensatory damages, nominal damages, punitive damages, declaratory relief, prejudgment and post-judgment interest, reasonable attorney's fees and costs under 42 U.S.C. § 1988, and all further relief the Court deems just and proper.

**COUNT III**
**FAILURE TO INTERVENE - 42 U.S.C. § 1983**
**(DEFENDANTS GRAHAM, PUSHOR, SPAIN, THOMAS, AND FRIDAY)**

105. Plaintiff incorporates paragraphs 1 through 76 as if fully set forth.

106. Each Defendant acted under color of state law and was present at the scene, participated in the detention, guarded Lukas, assisted the search or investigation, communicated with other officers about the detention, or otherwise became aware that Lukas was handcuffed and confined without a lawful basis.

107. An officer who is present at the scene and observes or has reason to know that another officer is violating a person's constitutional rights has an affirmative duty to take reasonable steps to protect the person when the officer is in a position to intervene and has a realistic opportunity to do so.

108. The underlying constitutional violations included the initiation or continuation of a seizure without reasonable suspicion, the transformation of any investigatory stop into a de facto arrest without probable cause, the prolongation

of the seizure beyond any lawful purpose, and the use or continuation of excessive force against a compliant and nonthreatening minor.

109. The violations were not instantaneous. Lukas was questioned, handcuffed, placed in a police vehicle, guarded, left confined while officers searched the construction site and sought his friends, questioned further, photographed, and held until officers elected to release him. The extended course of conduct gave each Defendant time to perceive what was occurring and a realistic opportunity to object, direct removal of the handcuffs, open the vehicle, release Lukas, contact a supervisor, or otherwise stop or curtail the violations.

110. Graham had actual knowledge and the clearest opportunity to intervene because he initiated and controlled the encounter, held the rank of lieutenant, directed responding personnel, requested additional units, observed or approved the handcuffing and confinement, and had authority to order Lukas's immediate release. Instead, Graham directed, encouraged, ratified, and prolonged the conduct.

111. Pushor, Spain, Thomas, and Friday learned through their observations, radio communications, conversations, guarding assignments, search activities, or participation that Lukas was a compliant injured minor; that no crime, victim, contraband, or incriminating evidence had been identified; that the

officers' stated objectives included locating other teenagers and creating a field-contact record; and that Lukas remained restrained in a police vehicle.

112. No Defendant reasonably could have believed that a compliant minor could continue to be handcuffed and confined merely to facilitate a search for third persons, compel information, document a field contact, or provide an educational lesson.

113. Each Defendant had the ability and sufficient time to take reasonable measures to end or reduce the unlawful seizure or force. None did so. Instead, each affirmatively assisted the operation, acquiesced in it, guarded Lukas, continued questioning or information gathering, assisted the unrelated search, or remained deliberately indifferent to the ongoing violation.

114. Each Defendant's failure to intervene directly and proximately caused the unconstitutional restraint to continue and deprived Lukas of an earlier release from handcuffs and police custody.

115. The duty to intervene in an ongoing unconstitutional seizure or use of force was clearly established, and a reasonable officer would have known that passive acquiescence was unlawful under the circumstances alleged.

116. As a direct and proximate result, Lukas suffered loss of liberty, physical discomfort, fear, humiliation, emotional distress, mental anguish, and other damages to be proven at trial.

WHEREFORE, Plaintiff demands judgment against Graham, Pushor, Spain, Thomas, and the Friday, jointly and severally as permitted by law, for compensatory damages, nominal damages, punitive damages, declaratory relief, prejudgment and post-judgment interest, reasonable attorney's fees and costs under 42 U.S.C. § 1988, and all further relief the Court deems just and proper.

**COUNT IV**
**MUNICIPAL LIABILITY - 42 U.S.C. § 1983**
**(DEFENDANT CITY OF WINTER PARK ONLY)**

117. Plaintiff incorporates paragraphs 1 through 76 as if fully set forth.

118. The City is a "person" subject to suit under 42 U.S.C. § 1983. Plaintiff does not seek to hold the City liable merely because it employed the individual officers and does not rely on *respondeat superior*.

119. As alleged in Counts I through III, City officers acting under color of law deprived Lukas of clearly protected Fourth Amendment rights by seizing and prolonging the detention without reasonable suspicion or probable cause, using excessive force, and failing to intervene.

120. The constitutional injuries were caused by one or more official policies, formally adopted or informally established customs or practices, decisions of municipal officials with final policymaking authority, deliberately indifferent failures to train or supervise, or knowing ratification of unconstitutional conduct.

121. The relevant policies, customs, and practices included permitting or tolerating officers to: (a) initiate juvenile field contacts based on generalized "unusual" behavior rather than individualized suspicion of a specific offense; (b) treat avoidance of an unidentified or unmarked vehicle as evidence of criminality; (c) handcuff and confine compliant minors in the absence of individualized danger or flight; (d) prolong a detention to identify, locate, question, or compel the return of third persons; (e) threaten unsupported loitering-and-prowling, trespass, burglary, resisting, affidavit, or 911-related consequences to compel cooperation; (f) collect photographs and personal information for field-contact intelligence when no crime has occurred; and (g) fail to intervene in an unlawful seizure or use of force.

122. The conduct was carried out openly and collectively by a lieutenant and multiple responding officers. No officer treated the handcuffing, vehicle confinement, coercive questioning, or prolonged detention as a deviation requiring correction. Their coordinated conduct supports the inference that the practices were known, accepted, expected, or routinely tolerated within WPPD rather than the product of one officer's isolated mistake.

123. Graham exercised supervisory authority at the scene, initiated the operation, summoned additional officers, directed the investigation and search, controlled Lukas's custody, and caused the creation of a field-contact record. To

the extent discovery establishes that Graham possessed final municipal policymaking authority for the relevant function, his deliberate choices constituted City policy for this incident. Alternatively, his conduct and the coordinated acceptance by other officers evidence an established custom or failure of training and supervision.

124. WPPD's field-contact material referenced "similar incidents/contact with these juveniles," and Graham stated that an earlier juvenile contact potentially established a "pattern." Those statements support the inference that WPPD personnel were aware of prior juvenile contacts and used field-contact documentation to justify heightened police intervention in later encounters even when no offense was reported.

125. The City knew or should have known that officers would regularly encounter minors, pedestrians, persons who decline voluntary questioning, and persons who move away from unmarked vehicles. The need to train officers on consensual encounters, reasonable suspicion, the limits of Terry detention, handcuffing, juvenile vulnerability, detention duration, loitering-and-prowling requirements, and the duty to intervene was obvious.

126. The City's training and supervisory system was deliberately indifferent because it failed to provide or enforce adequate instruction, review, correction, and discipline concerning those recurring constitutional requirements,

despite the known or obvious consequence that officers would seize and restrain persons who had committed no crime.

127. Alternatively, after receiving body-camera recordings, reports, field-contact documentation, public-records demands, and written notice describing the incident, officials with authority to review and correct officer conduct approved the conduct, failed to meaningfully investigate or discipline it, continued the relevant practices, or otherwise ratified the basis for the detention. Plaintiff will identify the responsible policymakers and particulars through discovery.

128. Each policy, custom, deliberately indifferent omission, policymaker decision, or ratification alleged above was closely related to and the moving force behind the constitutional violations. The violations were a plainly foreseeable consequence of allowing officers to use coercive detention and handcuffs to investigate lawful juvenile activity, secure cooperation, locate third persons, and create field-contact intelligence.

129. As a direct and proximate result of the City's own acts and omissions, Lukas sustained the injuries and damages alleged herein.

WHEREFORE, Plaintiff demands judgment against the City for compensatory and nominal damages, appropriate declaratory and prospective equitable relief, prejudgment and post-judgment interest, reasonable attorney's

fees and costs under 42 U.S.C. § 1988, and all further relief the Court deems just and proper.

**COUNT V**
**FALSE IMPRISONMENT**
**(DEFENDANT CITY OF WINTER PARK ONLY)**

130. Plaintiff incorporates paragraphs 1 through 76 as if fully set forth.

131. This claim is pleaded subject to all applicable notice and presentment requirements of § 768.28, Fla. Stat.

132. Under Florida law, false imprisonment consists of the unlawful restraint of a person against that person's will, with the restraint being unreasonable and unwarranted under the circumstances. The tort is complete when the defendant, without lawful authority, directly or indirectly causes the plaintiff to be confined or restrained.

133. WPPD officers intentionally restrained Lukas against his will by commanding him to stop and remain, controlling his movement, placing his hands behind his back, applying handcuffs, placing him in the rear of a police vehicle, guarding the vehicle, restricting his telephone use, refusing his requests for release or parental contact, and continuing custody until officers elected to release him.

134. Lukas was conscious of the confinement, submitted to police authority, and was not free to leave. His repeated questions, expressions of fear,

requests to contact his parents, attempt to call 911, and objections to being confined demonstrate that the restraint was against his will.

135. The restraint was unlawful because officers lacked reasonable suspicion to initiate or continue an investigatory detention and lacked probable cause to arrest Lukas. No warrant authorized the confinement, no recognized privilege justified it, and no crime or evidence of a crime was discovered during the detention.

136. The restraint was unreasonable and unwarranted because Lukas was a compliant, visibly injured minor; had committed no observed offense; posed no threat; did not resist or flee after the police command; and was detained to facilitate the location of other teenagers, a construction-site search, questioning, photography, identification, field-contact documentation, and an asserted educational purpose.

137. The officers' decision to continue the restraint after the search revealed no evidence and after any possible basis for investigation had been dispelled constituted an additional period of false imprisonment.

138. At all material times, the involved WPPD officers were acting within the course and scope of their City employment and were furthering, or purporting to further, City police functions. For purposes of this vicarious-liability claim, Plaintiff alleges that the officers acted without bad faith, malicious purpose, or

wanton and willful disregard of human rights, safety, or property within the meaning of § 768.28(9)(a), Fla. Stat, Florida Statutes.

139. The City is vicariously liable for the false imprisonment committed by its employees within the course and scope of employment, subject to the limitations and procedures of § 768.28, Fla. Stat.

140. The unlawful confinement directly and proximately caused Lukas to suffer loss of liberty, physical discomfort, fear, humiliation, emotional distress, mental anguish, and other compensable damages.

WHEREFORE, Plaintiff demands judgment against the City for compensatory damages, taxable costs and interest to the extent permitted by law, and all further relief available under Florida law, subject to § 768.28, Fla. Stat.

## COUNT VI
## BATTERY
## (DEFENDANTS EWING AND CITY OF WINTER PARK ONLY)

141. Plaintiff incorporates paragraphs 1 through 43 as if fully set forth.

142. This claim is pleaded subject to all applicable notice and presentment requirements of § 768.28, Fla. Stat.

143. Under Florida law, battery occurs when a person intentionally causes a harmful or offensive contact with another person, or intentionally causes an object or force to make such contact, without consent or legal privilege.

144. Ewing intentionally touched and restrained Lukas by seizing his arms and wrists, placing his hands behind his back, applying handcuffs, physically directing or placing him into the rear of a police vehicle, and maintaining physical restraint. The resulting contacts were deliberate rather than accidental.

145. The contacts were harmful or offensive because they imposed physical restraint and discomfort upon a nonconsenting sixteen-year-old, interfered with his bodily autonomy and freedom of movement, and occurred after he had complied and while he was visibly injured and surrounded by officers.

146. Lukas did not consent to the handcuffing, physical placement, or confinement. His submission to asserted police authority did not constitute voluntary consent.

147. A police officer is privileged to use only force reasonably necessary to accomplish a lawful detention or arrest. The privilege did not apply because the detention lacked reasonable suspicion or probable cause. Alternatively, even if some temporary detention were lawful, the handcuffing and vehicle confinement exceeded the amount of force reasonably necessary under the circumstances.

148. The force was unnecessary and excessive because Lukas was unarmed, compliant, nonthreatening, visibly injured, not actively resisting, and

not attempting to flee after the police command. The officers had complete numerical and positional control, and less intrusive means were readily available.

149. Ewing's continued maintenance of the restraints after any possible safety or investigative need dissipated constituted a further unprivileged battery.

150. At all material times, Ewing acted within the course and scope of City employment and was furthering, or purporting to further, City police functions. For purposes of this vicarious-liability claim, Plaintiff alleges that Ewing acted without bad faith, malicious purpose, or wanton and willful disregard of human rights, safety, or property within the meaning of § 768.28(9)(a), Fla. Stat.

151. The City is vicariously liable for Ewing's battery committed within the course and scope of employment, subject to the limitations and procedures of § 768.28, Fla. Stat.

152. The battery directly and proximately caused physical pain or discomfort, fear, humiliation, emotional distress, mental anguish, and other compensable damages.

WHEREFORE, Plaintiff demands judgment against the City for compensatory damages, taxable costs and interest to the extent permitted by law, and all further relief available under Florida law, subject to § 768.28, Fla. Stat.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court:

A. Enter judgment in Plaintiff's favor on all claims;

B. Award compensatory damages in an amount determined by the jury;

C. Award nominal damages for each constitutional violation where compensatory damages are not otherwise awarded;

D. Enter appropriate declaratory and equitable relief;

E. Award reasonable attorney's fees and costs under 42 U.S.C. § 1988 and other applicable law;

F. Award prejudgment and post-judgment interest; and

G. Grant all further relief the Court deems just and proper.

## RESERVATION OF RIGHT TO SEEK PUNITIVE DAMAGES

The Plaintiff reserves the right to amend this Complaint upon sufficient information to seek punitive damages as allowed by law.

## JURY DEMAND

Plaintiff demands a trial by jury on every issue so triable under Federal Rule of Civil Procedure 38.

Respectfully submitted,

*/s/ Ryan J. Vescio*
Ryan J. Vescio, Esquire
Florida Bar Number: 14032
NEJAME LAW, P.A
111 N. Orange Ave., Ste. 1300
Orlando, FL 32801
PH: (407) 500-0000
F: (407) 802-1653
ryan@nejamelaw.com
thomas@nejamelaw.com
civilservice@nejamelaw.com